# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| EVIS BRINSON, | ) | CASE NO. 5:21-cv-1638 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| SUMMIT COUNTY, et al., | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Pending before this Court is the motion for summary judgment filed by defendants Eric Czetli ("Czetli"), Kandy Fatheree ("Fatheree"), and Summit County (collectively, "defendants"). (Doc. No. 79 (Motion).) Plaintiff Evis Brinson ("Brinson") filed an opposition (Doc. No. 86 (Opposition)), and defendants filed a reply (Doc. No. 90 (Reply)). For the reasons discussed herein, defendants' motion for summary judgment is GRANTED, and this case is dismissed.

## I.    BACKGROUND

As discussed at length in this Court's previous memorandum opinion and order resolving defendants' motion for partial judgment on the pleadings, Brinson's claims against defendants stem from his employment as and termination from the position of Director of Diversity and Outreach for the Summit County Sheriff's Office ("Director of Diversity"). (*See generally* Doc. No. 30.)

While the parties disagree on many things, the following facts are undisputed: After assisting Fatheree with her successful campaign for Summit County Sheriff (Doc. No. 66-1

(Deposition of Evis Brinson), at 70:1–72:8[1]; Doc. No. 69-1 (Deposition of Kandy Fatheree), at 289:23–290:2), Brinson applied and interviewed to be hired as the first ever Director of Diversity in the Summit County Sheriff's Office (Doc. No. 66-1, at 103:3–21)—a position Fatheree created as the newly elected Sheriff. (*Id.* at 137:11–23; Doc. No. 69-1, at 321:9–18.) Ultimately, on March 1, 2021, Brinson was hired for the position as an at-will employee. (Doc. No. 66-1, at 178:19–179:5.)

Almost immediately after Brinson began working as the Director of Diversity, Brinson and defendants began perceiving issues with each other. Brinson contends that he faced race discrimination and retaliation for attempting to promote diversity and inclusion within the Sheriff's Office. (*See, e.g.*, Doc. No. 66-1, at 196:8–24, 267:9–18, 527:25–528:10.) Fatheree contends, however, that Brinson showed to be unprofessional and not as well suited for the role as she believed when she hired him. (*See, e.g.*, Doc. No 69-1, at 268:2–12, 410:24–411:5, 416:3–8, 465:6–17.) On March 26, 2021, after only 26 days as Director of Diversity, Fatheree terminated Brinson's at-will employment. (Doc. No. 66-1, at 178:4–9.)

Brinson filed the instant action on August 23, 2021. (*See generally* Doc. No. 1 (Complaint).) Brinson's operative third amended complaint, filed on March 15, 2022, alleged a total of twelve different causes of action[2] against Czetli, Fatheree, Summit County, and John Does

---

[1] All page number references herein are to the consecutive page numbers applied to each individual document by the electronic filing system.

[2] Brinson alleged claims of (1) discrimination, retaliation, and hostile work environment in violation of 42 U.S.C. § 1981; (2) discrimination, retaliation and hostile work environment in violation of 42 U.S.C. § 1983; (3) discrimination, retaliation and hostile work environment in violation of 42 U.S.C. § 2000e; (4) race discrimination in violation of Ohio Rev. Code § 4112.02(A); (5) retaliation in violation of Ohio Rev. Code § 4112.02(1); (6) hostile work environment in violation of Ohio Rev. Code § 4112.02(A); (7) aiding and abetting discrimination in violation of Ohio Rev. Code § 4112.02(J); (8) tortious interference with business relationships; (9) intentional infliction of emotional distress; (10) negligent retention, training and supervision under Ohio law; (11) fraudulent inducement/fraud; and (12)

1-10. (*See generally* Doc. No. 30.) On June 29, 2022, defendants filed a motion for partial judgment on the pleadings. On November 30, 2022, this Court granted in part and denied in part defendants' motion for partial judgment on the pleadings. As a result, this case proceeded with the following claims only:

1. Brinson's claim against Fatheree for a discrete act of racial discrimination in violation of the Fourteenth Amendment's Equal Protection Clause under 42 U.S.C. § 1983 (second cause of action);

2. Brinson's claim against Fatheree for retaliation in violation of the First Amendment under 42 U.S.C. § 1983 (second cause of action);

3. Brinson's *Monell* claim against Summit County based on the theory that Fatheree ratified a hostile work environment of racial discrimination (second cause of action);

4. Brinson's claims against Summit County for discrimination, retaliation, and hostile work environment in violation of 42 U.S.C. § 2000e (third cause of action);

5. Brinson's claim against Summit County for race discrimination in violation of Ohio law (fourth cause of action);

6. Brinson's claims against Fatheree and Summit County for retaliation in violation of state anti-discrimination laws (fifth cause of action);

7. Brinson's claim against Summit County for a hostile work environment in violation of Ohio law (sixth cause of action);

8. Brinson's claims against Fatheree, Czetli, and Summit County for aiding-and-abetting discrimination in violation of Ohio law (seventh cause of action);

9. Brinson's claim against Fatheree for tortious interference with a business relationship in violation of Ohio law (eight cause of action); and

10. Brinson's claims against Summit County for negligent training and negligent supervision in violation of Ohio law (tenth cause of action).

---

promissory estoppel. (Doc. No. 30 ¶¶ 85–193.)

(*See* Doc. No. 64, at 39–40.) On December 9, 2022, defendants filed the instant motion for summary judgment, seeking dismissal of all these remaining claims. (Doc. No. 79.) On January 9, 2023, Brinson filed his opposition (Doc. No. 86), and on January 30, 2023, defendants filed a reply (Doc. No. 90). This matter is now ripe for the Court's review.

## II. Legal Standard – Motion for Summary Judgment

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). In most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

"Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant

probative evidence must be presented to support the complaint." *Goins v. Clorox Co*., 926 F.2d 559, 561 (6th Cir. 1991). "The nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Fulson v. Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). "The trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) (citing *Frito–Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ*., 351 F.3d 240, 247 (6th Cir. 2003). Under this standard, "the mere existence of some factual dispute will not frustrate an otherwise proper summary judgment [motion]." *Dunigan v. Noble*, 390 F.3d 486, 491 (6th Cir. 2004) (quotation marks and emphasis omitted) (citing *Anderson*, 477 U.S. at 247–48).

## III.    DISCUSSION

In their motion, defendants contend that they are entitled to judgment on all Brinson's remaining claims.

### 1.    Brinson Cannot Point to Any Discrete Act of Racial Discrimination to Advance his Section 1983 Claim Against Fatheree for a Violation of the Fourteenth Amendment's Equal Protection Clause.

While terminating someone because of their race is an unlawful discrete discriminatory act, Brinson has failed to produce *any* evidence that suggests Fatheree terminated him because of his race. *See Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 993–94 (6th Cir. 2009) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002)). This Court only narrowly allowed Brinson's Equal Protection Clause claim to proceed against Fatheree because Brinson had alleged in his complaint that Fatheree told Brinson "the deputies and chiefs would never accept him as a Director because he was African-American [sic]," firing him shortly thereafter. (Doc. No. 64, at 10–11 (citing Doc. No. 30 ¶¶ 50–51).) This Court found that although it was a "close call" the allegation raised "a conceivable inference that Fatheree decided to terminate Brinson because, in her view, Brinson, as an African American, would never be accepted by her staff." (*Id.* at 11.) But fact discovery has now revealed that Fatheree never said that "the deputies and chiefs would never accept [Brinson] as a Director *because he was African-American* [sic]." (*See* Doc. No. 30 ¶¶ 50–51 (emphasis added).) Fatheree may have told Brinson that the deputies and chiefs would never accept him, but it is undisputed that she never said that it was because of his race. (Doc. No. 66-1, at 415:12–417:4.) Connecting Fatheree's statement to race was entirely Brinson's own inference and speculation. (*Id.* at 409:1–10; 416:18–417:4.) It is well established that speculation and unsubstantiated assertions are not evidence and are not sufficient

6

to defeat a well-supported motion for summary judgment. *See Lujan*, 497 U.S. at 888. Further, it is undisputed that Fatheree hired an African American person to replace Brinson, which rebuts any suggestions that Fatheree believed her staff would never accept an African American Director of Diversity.[3] (Doc. No. 66-1, at 418:21–419:5.)

Brinson's claim that Fatheree terminated his employment because she believed that her staff would never accept an African American was the only plausible discrete act of discrimination that Brinson sufficiently alleged against Fatheree in his complaint, and Brinson has not pointed to any other discrete acts of race discrimination by Fatheree that emerged during fact discovery.[4] As such, even viewing the evidence in a light most favorable to Brinson, the Court concludes that Fatheree is entitled to judgment as a matter of law on Brinson's Section 1983 claim against her and the claim is dismissed.

---

[3] In an apparent attempt to save his claim, Brinson suggests Fatheree fired him because her staff would never accept an African American *man*, and even misleadingly cites this Court's own decision in the process. (Doc. No. 86, at 28 (suggesting incorrectly that the Court found Brinson would be able to satisfy the elements of his claim by showing Fatheree recognized her staff had an intolerance for Brinson because he was an "African-American[sic] *man*" (emphasis added)).) Brinson has not alleged any claims of gender-based discrimination in this case and so his identity as a man is irrelevant to the Court's analysis.

[4] Brinson seems to suggest the fact that he had to apply and interview for the Director of Diversity position, instead of being given the position outright, amounts to race discrimination. (*See* Doc. No. 86, at 27.) But Brinson has not cited any case law that suggests making an applicant interview for a job, which they are ultimately offered, amounts to discrimination and this Court declines to hold that it does here. *Cf. Hunter*, 565 F.3d at 994 (finding discrimination based on a discrete act is a discriminatory action based on the plaintiff's race, including "termination, failure to promote, denial of transfer, or refusal to hire" (citing *Morgan*, 536 U.S. at 114 (internal quotation marks omitted))).

Brinson also takes issue with Fatheree's statement that she had "one shot" to get the Director of Diversity position right and claims Fatheree held him to a higher standard because of this. Even if this were true, Brinson has not pointed to any evidence that suggests these higher standards were because of his race rather than because of the importance of the position he held. As Brinson evinces through his own pleadings, Fatheree looked to tackle long-held perceptions that the Summit County Sheriff's Office was a "good ole boys network," which was "resistant" to change, especially changes related to increased diversity and inclusion efforts. (*See* Doc. No. 86, at 27.) It follows that Fatheree would want to ensure she had the right person to help her lead these efforts.

**2. Brinson Has Not Established that Fatheree Retaliated Against Him for Any Protected Speech in Violation of the First Amendment.**

To establish retaliation under the First Amendment, Brinson must show (1) that his statements were protected under the First Amendment; (2) that he suffered an adverse employment action; and (3) that the adverse action was motivated at least in part as a response to the exercise of his constitutional rights. *Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345, 348 (6th Cir. 2010) (citations, quotations, and alterations omitted). Speech of a public employee is only subject to First Amendment protections when (1) the speech addressed a matter of "public concern[,]" (2) the employee spoke as a "private citizen" rather than as an "employee pursuant to his official duties[,]" and (3) the employee's "speech interest outweighs the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Mayhew v. Town of Smyrna*, 856 F.3d 456, 462 (6th Cir. 2017) (internal quotation marks and citations omitted). In determining whether an employee speaks as a private citizen or as a public employee, the "critical question" is "whether the speech at issue is itself ordinarily within the scope of [the] employee's duties, not whether it merely concerns those duties." *Id.* at 464 (quoting *Lane v. Franks*, 573 U.S. 228, 240, 134 S. Ct. 2369, 189 L. Ed. 2d 312 (2014) (internal quotation marks omitted).

A public employee's report of discrimination that he or she personally faced because of their race is considered protected speech made as a private citizen. *Jennings v. Wayne Cnty.*, No. 13-10392, 2015 WL 5589869, at *18 (E.D. Mich. Sept. 22, 2015) (finding officer's report of sexual harassment she suffered was a matter of public concern and not made pursuant to her official duties). But a public employee's report of racial discrimination directed against others is not protected speech if it is part of the employee's official job duties to report potential discrimination.

8

*Harrison v. Oakland Cnty.*, 612 F. Supp. 2d 848, 867 (E.D. Mich. 2009) (finding that supervisor's report of subordinate's sexual harassment was not protected speech because it was within the supervisor's official duties to make such a report).

Brinson points to four "reports" that he contends he made to Fatheree and are protected conduct that caused Fatheree to retaliate against him:

(1) reporting racially hostile, harassing and biased comments made to him by Smith on several occasions (including in Fatheree's presence);

(2) reporting the targeting and pushback he received in response to his efforts to identify and oppose racial and other inequalities and biases;

(3) reporting the barriers and restrictions placed on his ability to perform his essential job functions, particularly those related to race and opposing discrimination and bias; and

(4) reporting the potential race discrimination he discovered against another African-American[sic] employee.

(Doc. No. 86, at 29 (footnotes omitted).[5])

To the extent Brinson reported race discrimination directed at him personally, such a report is considered protected speech made as a private citizen. *Jennings*, 2015 WL 5589869, at *18. But to the extent Brinson reported any instance of race discrimination directed at others, this is not protected speech because it is part of his official job duties to report potential discrimination. (Doc. No. 66-1, at 221:1–4.) *Harrison*, 612 F. Supp. 2d at 867. Further, Brinson concedes that his duties

---

[5] Rather than point to any specific record citations to support his contention that these alleged "reports" can establish his retaliation claim, Brinson cites, as he does throughout his opposition brief, to a series of earlier footnotes filled with vague citations. The Court shares defendants' frustration with this methodology and finds that, in employing this methodology, Brinson has failed to satisfy his obligation to cite "specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Fulson*, 801 F. Supp. at 4. (*See also* Doc. No. 3 (Initial Sanding Order), at 4 ("All facts presented to the Court in any brief or memorandum setting forth a party's position with respect to a motion must be supported by pinpoint citations to the case record.").)

as Director of Diversity included addressing "racial inequalities." (Doc. No. 66-1, at 513:2–7; *see also id.* at 169:3–20.[6]) Thus, any reports Brinson made to Fatheree addressing perceived racial inequalities within the Sheriff's Office were likewise made pursuant to his official job duties and are not protected speech. *Laurie v. Walder*, No. 21-cv-1112, 2021 WL 5760541, at *3 (N.D. Ohio Dec. 3, 2021) ("[A] public employee does not plead constitutionally protected speech where the speech at issue 'owes its existence to a public employee's professional responsibilities.'" (quoting *Mayhew*, 856 F.3d at 464)). As discussed below, none of Brinson's contended "reports" amount to protected speech under the First Amendment.

### a) Chief Smith's Comments

There is no well-supported evidence in the record that Brinson ever told Fatheree that he felt racially harassed or discriminated against because of comments Chief Doug Smith ("Chief Smith") made about the deaths of Breonna Taylor and/or George Floyd. Brinson's declaration that he told Fatheree that Chief Smith's comments offended him (Doc. No. 86-6 (Declaration of Evis Brinson) ¶ 38), directly contradicts Brinson's testimony that he never reported any perceived racial discrimination to Fatheree. (*E.g.*, Doc. No. 66-1, at 552:2–7.) Brinson "cannot create a genuine

---

[6] Brinson contends in his opposition brief that "[d]efendants' claim that Mr. Brinson's conduct cannot be considered constitutionally protected speech because it was part of his job duties has no merit. Defendants have consistently insisted that Mr. Brinson was never responsible for investigating and reporting racial biases and other inequalities." (Doc. No. 86, at 30 (emphasis omitted).) Brinson, however, does not cite *any* evidence supporting his contention that defendants have "consistently insisted that" Brinson was not responsible for investigating and reporting racial inequalities. *Fulson*, 801 F. Supp. at 4 ("[T]he nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact."); *see also Street*, 886 F.2d at 1479–80 ("The trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." (citing *Frito–Lay, Inc.*, 863 F.2d at 1034)). The record before the Court is that Brinson testified that his job duties included addressing racial inequalities and defendants do not dispute that testimony. (*See* Doc. No. 79, at 22–23 ("[A]s [Director of Diversity], any alleged statements or discussions regarding racial inequities were not made as a private citizen, but rather pursuant to [Brinson's] official job duties."); *see also* Doc. No. 69-1, at 383:23–384:2.)

10

issue of material fact by filing a[ declaration], after a motion for summary judgment has been made, that essentially contradicts his earlier deposition testimony." *Arel, S.R.L. v. PCC Airfoils, LLC*, 448 F.3d 899, 906 (6th Cir. 2006) (quoting *Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir. 1997)).

To be sure, Brinson does not cite any testimony that he reported Smith's comments to Fatheree—only that Fatheree was present for at least some of Chief Smith's comments. (*See, e.g.*, Doc. No. 66-1, at 339:5–340:16; *see also* Doc. No. 69-1, at 455:22-456:21). But there is no evidence that Brinson ever reported feeling harassed or discriminated against based on that conversation. When asked at his deposition whether he ever told Fatheree that he felt discriminated against because of his race, Brinson repeatedly testified that he did not. (Doc. No. 66-1, at 339:5–10, 409:12–411:22, 552:2–7.)

Fatheree cannot be liable for retaliating against Brinson for reporting that he felt harassed or discriminated against because of Chief Smith's comments when there is no evidence in the record that Brinson ever reported those feelings to Fatheree. Further, even if Brinson had reported this perceived discrimination to Fatheree, Brinson has not cited any evidence (beyond his own conclusions) that he was subjected to any adverse employment actions because of such a report. For these reasons, Brinson's non-existent "report" about Chief Smith's comments cannot serve to advance Brinson's retaliation claim against Fatheree.

**b) Targeting and Pushback Brinson Received in Response to His Efforts to Identify and Oppose Racial and Other Inequalities and Biases**

Brinson fails to specify what he means by "targeting and pushback" or cite any specific evidence of the same,[7] but this Court presumes—based on Brinson's deposition testimony concerning "targeting"—that he is referring to an incident following an email he sent on March 11, 2021, to only black deputies about a Black Male Summit at the University of Akron (the "Black Male Summit Email"). (*See* Doc. No. 66-14.)

After Brinson sent the Black Male Summit Email, a black deputy complained that the email was not sent to all deputies. (Doc. No 79-4 (Declaration of Corey Thompson) ¶¶ 3–9.) The deputy declared that he felt Brinson's email was "divisive, not inclusive, and not consistent with the role [Brinson] held[.]" (*Id.* ¶ 8.) Chief Smith and Czetli met with Brinson, reported the deputy's complaint, and told Brinson to send the email to all deputies, regardless of their race. (Doc. No. 77-1 (Deposition of Doug Smith), at 334:22–336:20; Doc. No. 69-1, at 395:7–396:9; Doc. No. 66-1, at 240:09–241:4.) Brinson testified that he then met with Fatheree and told her that he felt Chief Smith and Czetli were "[]wrongfully target[ing]" him because Brinson believed Fatheree gave him permission to send the email to black deputies only. (Doc. No. 66-1, at 232:14–233:4.)

While there seems to be disagreement over the extent to which Brinson received prior approval to send the email to black deputies only (Doc. No. 66-1, at 232:9–235:18; Doc. No. 69-1, at 395:7–17), that disagreement is immaterial because it is undisputed that Brinson never told Fatheree that he felt that Chief Smith and Czetli were targeting Brinson *because of his race* when

---

[7] Again failing to provide pinpoint citations to the record, Brinson cites to "fn. 53," which in turn contains several citations to several different deposition testimonies and exhibits, which all together cover a range of topics.

they met with him, reported the deputy's complaint, and told Brinson to send the email to all deputies. (Doc. No. 66-1, at 236:11–22.) Brinson testified to his own conclusion that he was being "targeted" because of his race, but he very clearly testified that he never conveyed that conclusion or feeling to Fatheree, or anyone else, at the time. (*Id.*) As such, there is no evidence that suggests Brinson's follow up with Fatheree amounts to protected speech because there is no evidence that Brinson reported any perceived race discrimination.

For these reasons, Brinson's follow-up to the Black Male Summit Email is not protected speech and cannot serve to advance Brinson's retaliation claim.[8]

### c) Barriers and Restrictions Placed on Brinson's Ability to Perform His Essential Job Functions

Faced with undisputed evidence that he never explicitly told Fatheree that he was being discriminated against because of his race, Brinson unsuccessfully attempts to save his claim by relying on an email that he sent to Fatheree on March 21, 2021 (Doc. No. 66-20 (the "March 21, 2021 Email")), contending that it amounts to a report of race discrimination. (Doc. No. 86, at 20; Doc. No. 66-1, at 512:3–11.) But a review of the March 21, 2021 Email reveals nothing that could be read as reporting race discrimination, or any other matter of public concern.

In the March 21, 2021 Email, Brinson made several comments concerning his personal views on the appropriate reporting structure for his position and expressed displeasure that, in his

---

[8] Brinson does not contend that the Black Male Summit Email itself was protected speech. Nor does Brinson contend that Fatheree retaliated against him for sending the Black Male Summit Email. But to be sure, the Court finds that the Black Male Summit Email itself was not protected speech because it was made pursuant to Brinson's role as Director of Diversity, encouraging deputies' attendance at a public forum. While the public forum might address a matter of public concern, the email encouraging deputies' attendance is an entirely internal matter. *Doherty v. City of Maryville*, 431 F. App'x 381, 388 (6th Cir. 2011) ("'[T]he proper inquiry is *not* what might be incidentally conveyed by the speech, and that passing or fleeting references to an arguably public matter do not elevate the speech to a matter of public concern where the focus or point of the speech advances only a private interest.'" (quoting *Farhat v. Jopke*, 370 F.3d 580, 592–93 (6th Cir. 2004) (emphasis in original))).

view, he had been excluded from some "key communication discussions critical to [his] role[.]" (Doc. No. 66-20.) It is clear that Brinson was unhappy with his position's reporting structure and blamed the reporting structure for his exclusion from these "key communication discussions." (*Id.* ("Regardless of who occupies this position, they should not be left in the hands of anyone but the Sheriff. I have already been left out of key communication discussions critical to my role and should have been brought in at the conception or brought up to speed as soon as I started.").) But nowhere in the March 21, 2021 Email did Brinson say anything to suggest that he had faced any race discrimination by virtue of not reporting to the Sheriff. Brinson did not accuse anyone of excluding him from any "key communication discussions" on purpose, let alone excluding him because of his race. In fact, Brinson provided two examples of "key communication discussions," and he actually *was* included in one of them, albeit not as soon as he seemingly would have liked. (Doc. No. 66-1, at 301:24–302:7 (testifying that he did attend the "Green DEI Event").)

Brinson's March 21, 2021 Email then listed several vague resources and conditions he believed were necessary to effectively perform his job. (Doc. No. 66-20.) But, again, Brinson did not say anything in the email that would suggest anyone was purposefully denying him access to any of these resources or conditions, let alone denying him access because of his race. In fact, Brinson testified that he actually was readily provided numerous resources and assistance necessary to perform his job duties (*see, e.g.*, Doc. No. 66-1, at 522:18–526:21), including some of the resources specifically identified in the March 21, 2021 Email. (*Compare* Doc. No. 66-1, at 291:16–22 (testifying that he did receive some statistics from the Jail), with Doc. No. 66-20 ("[c]ollect[ing] [d]ata from departments); *compare also* Doc. No. 66-1, at 301:2–22 (testifying that

he was offered the opportunity to schedule a ride-along with a deputy), with Doc. No. 66-20 ("shadowing all departments").)

Further, the fact that part of Brinson's role was to address matters of public concern (racial inequalities), does not automatically convert all Brinson's workplace conduct to a matter of public concern. Brinson's complaints about his reporting structure and resources for his position are focused on his personal interests rather than matters of public concern. Disputes about personal interest are not protected speech, even when they tangentially touch matters of public concern. *See Rose v. Stephens*, 117 F. Supp. 2d 607, 609–10 (E.D. Ky. 2000) (finding internal memorandum concerning "internal power struggle" was not a matter of public concern protected by the First Amendment).

The closest Brinson comes to establishing that his March 21, 2021 Email involved a matter of public concern is his contention that he was complaining to Fatheree that race was "off the table" and he was prohibited from addressing racial inequalities within the Sheriff's Office. (Doc. No. 86, at 21.) But Brinson has not pointed to any evidence, besides his own conclusions, that he was not allowed to address racial inequalities within the Sheriff's Office. Rather, Brinson's actual testimony is that Fatheree told him to take a "softer approach," which Brinson concluded on his own to mean that race was "off the table." (Doc. No. 66-1, at 518:9–519:5; *see also* Doc. No. 69-1, at 411:2–5 (testifying that she told Brinson to take a "softer approach").) There is no other evidence to suggest the Director of Diversity was, in fact, restricted from addressing race. In fact, Brinson attended an event with Fatheree on March 20, 2021 (after he claims she told him to take a "soft" approach), during which Fatheree explicitly mentioned race when talking about the importance of diversity and inclusion. (*See* Doc. No. 80 (Videotape Recording), at 2:52–3:33.)

15

Brinson himself mentioned during the event that he was looking at data related to race at the Sheriff's Office. (*Id.* at 19:08–19:37.) Brinson and Fatheree also directly addressed questions about the intersection of race and policing. For example, Fatheree said that Brinson would be part of any response to a civil complaint that a deputy was "profiling." (*Id.* at 54:56–55:24.) Brinson's replacement as Director of Diversity also testified that she addresses race as part of her duties. (*See, e.g.*, Doc. No. 74-1 (Deposition of Ester Thomas), at 315:6–20.) Even further, Brinson's own email from March 25, 2021, mentions he will "move froward" with discussing "racial equity – diversity." (Doc. No. 79-1, at 19 (Exhibit E).)

In sum, the March 21, 2021 Email evinces an internal dispute concerning Brinson's preferred reporting structure, resources, and focus—not a complaint that the Sheriff told the Director of Diversity he could not address race at all or a report that the Director of Diversity was being discriminated against because of his race. As such, the March 21, 2021 Email cannot serve as protected speech to advance Brinson's retaliation claim.

### d) Tina Outley

Brinson testified that he reported a potential race discrimination issue to Fatheree concerning a Sheriff's Office employee by the name of Tina Outley ("Outley"). (Doc. No. 66-1, at 413:15–414:3; 548:7–549:12.) According to Brinson's testimony, someone besides Outley alerted Brinson to the potential race discrimination. (*Id.*) Brinson testified that he spoke with Outley who told him that her white colleagues at the Sheriff's Office went to lunch without inviting her. (*Id.* at 413:19–25.) Brinson testified that he then alerted Fatheree to this situation. (*Id.* at 414:1–3.)

16

It is undisputed that this report did not concern any race discrimination directed at Brinson personally. Rather, Brinson, in his role as a Sheriff's Office employee, investigated a potential claim of race discrimination and then reported the same to Fatheree. Brinson testified that the Summit County Sheriff's Office Rules and Regulations required any employee who became aware of potential discrimination or harassment to report it. (Doc. No. 66-1, at 221:1–4.) As such, Brinson was acting within the scope of his duties when he reported the incident of potential discrimination to Fatheree. *See Harrison*, 612 F. Supp. 2d at 867.

Further, nothing in the record suggests that Brinson reported the potential instance of race discrimination to anyone besides Fatheree. *Cf. See v. City of Elyria*, 502 F.3d 484, 493 (6th Cir. 2007) (holding that a city police officer's statements to the FBI alleging corruption within the city police department were constitutionally protected as a matter of public concern and made outside the officer's duties because the officer reported his employer's illegal acts to an outside law enforcement agency, rather than solely to his supervisors); *Stinebaugh v. City of Wapakoneta*, 630 F. App'x 522, 523, 528 (6th Cir. 2015) (holding fire captain's discussions with city council members regarding the financial maladministration of the fire department constituted speech as a citizen when made as "a concerned tax paying citizen" and was off-duty and out of uniform when he addressed council members). For these reasons, any report to Fatheree concerning a potential instance of race discrimination within the Sheriff's Office was within the scope of Brinson's duties and made as a public employee rather than as a private citizen. Thus, this report is not considered protected conduct and cannot serve to advance Brinson's First Amendment retaliation claim.

But even if the report were considered protected conduct, Brinson has not pointed to any evidence that suggests Fatheree fired him because of this report. By Brinson's own admission, he

reported potential discrimination to Fatheree and did not know "where [it] went after that," suggesting the issue never came up again. (Doc. No. 66-1, at 414:1–3.) Besides Brinson's own speculation, there is no evidence that Brinson's report of potential discrimination against Outley played any role in Fatheree's decision to terminate his employment. *Jennings v. Cnty. of Monroe*, 630 F. App'x 547, 555 (6th Cir. 2015) ("[S]peculation . . . is insufficient to defeat summary judgment. A party cannot defeat summary judgment with '[c]onclusory allegations, speculation, and unsubstantiated assertions.'" (citations omitted)).

For all the aforementioned reasons, the Courts finds there is no well-supported evidence in the record to suggest that Fatheree retaliated against Brinson for any constitutionally protected conduct and the Courts finds that no reasonable juror could find otherwise. Thus, Fatheree is entitled to judgment as a matter of law on Brinson's claim of retaliation in violation of the First Amendment and this claim is dismissed.

### 3.  Brinson Cannot Establish His *Monell* Claim Against Summit County Because He Cannot Establish the Underlying Claims of Hostile Work Environment.

To maintain his *Monell* claim against Summit County, Brinson must first establish that he was deprived of a right guaranteed by the Constitution or federal law—and he cannot. *Cash v. Hamilton Cnty. Dep't of Adult Prob.*, 388 F.3d 539, 542 (6th Cir. 2004) (describing two-step analysis in the Sixth Circuit when considering a municipal-liability claim: (1) whether plaintiff asserted the deprivation of a right guaranteed by the Constitution or federal law, and (2) whether the alleged deprivation was caused by the defendants acting under color of state law). The Court has now dismissed Brinson's claims of race discrimination under the Fourteenth Amendment and

retaliation in violation of the First Amendment.[9] Thus, the only possible remaining alleged violation that could support Brinson's *Monell* claim against Summit County is his claim that Fatheree ratified a hostile work environment of racial discrimination in violation of the Equal Protection Clause and 42 U.S.C. § 2000e ("Title VII").[10] Brinson, however, has failed to produce any evidence to support an underlying hostile work environment claim.

To establish his hostile work environment claim, Brinson must show that (1) he belonged to a protected group, (2) he was subjected to unwelcome harassment, (3) the harassment was based on his protected status, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act. *Boxill v. O'Grady*, 935 F.3d 510, 520 (6th Cir. 2019) (citing *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 813 (6th Cir. 2013) (further citation omitted)). The Sixth Circuit "'has established a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory.'" *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 482 (6th Cir. 2020) (quoting *Phillips v. UAW Int'l*, 854 F.3d 323, 328 (6th Cir. 2017)). Hostile work environment claims "involve[ ] repeated conduct" and require the plaintiff to demonstrate that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the conditions of

---

[9] As discussed *infra*, Brinson's claims of race discrimination and retaliation in violation of Title VII are also dismissed.

[10] Brinson has alleged claims of hostile work environment in violation of the Equal Protection Clause, Title VII, and Ohio law. All three claims are analyzed using the same framework. *Boxill v. O'Grady*, 935 F.3d 510, 520 (6th Cir. 2019) ("We review § 1983 discrimination claims brought under the Equal Protection Clause using the same test applied under Title VII."); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (holding that claims brought under Title VII and Ohio state law are examined using the same legal framework).

the victim's employment and create an abusive working environment." *Hunter*, 565 F.3d at 994 (quoting *Morgan*, 536 U.S. at 115–16 (quotation marks omitted)).

Brinson does not point to any instances of harassment sufficient to establish his hostile work environment claim. Instead, in his opposition brief, Brinson cites to "the Sheriff's Office [] long-maintained [] 'good ole boys network' of employees, practices and attitudes that have subjected minorities – including African-Americans[sic] – to unlawful terms and conditions in their hiring and employment." (Doc. No. 86, at 32–33.) Brinson then contends that Fatheree knew that Brinson "was experiencing biased and unequal treatment[,]" that "his colleagues would never accept him because of his race and job duties," and that his colleagues "were secretly conducting investigations into [Brinson's] background to get him fired." (*Id.* at 33.) Brinson then claims that Fatheree "completely ignored all [] Brinson's complaints and ratified the conduct of her staff until she took direct action to retaliate against him, including terminating his employment." (*Id.*)

Brinson does not cite a single piece of evidence to support any of these claims in his opposition brief. As already discussed, it is undisputed that Fatheree never told Brinson that his colleagues would never accept him because of his race. (Doc. No. 66-1, at 415:12–417:4.) There is likewise no evidence that Fatheree told Brinson that his colleagues would not accept him because of his job duties (*see id.* at 417:21–418:2), but, even if she did, Brinson's claim is one of a hostile work environment because of his race and Brinson has not produced any evidence to suggest any colleagues would not accept his diversity initiatives because of his race. In contrast, the evidence suggests only that his colleagues *would* accept a black Director of Diversity because is undisputed that Fatheree hired a black Director of Diversity to replace Brinson, who remains employed in that position. (*Id.* at 418:21–419:6.) Further, there is no evidence that Brinson's replacement has not

been accepted by the Sheriff's Office staff. (*Cf.* Doc. No. 79-4 ¶ 11; Doc. No. 74-1, at 235:21–236:3, 237:21–24 (testifying that she was able to visit the jail and receive data from the jail—resources Brinson claims he was denied because of his race).)

Likewise, there is no evidence in the record, besides Brinson's own speculative testimony, to support his claim that his colleagues were looking into his background to get him fired because of his race. (Doc. No. 66-1, at 308:11–13, 345:14–18, 426:18–21.) Brinson's own conclusions, standing alone, are too speculative to support his claim of hostile work environment. *See Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009) ("The court's duty to view the facts in the light most favorable to the nonmovant does not require or permit the court to accept mere allegations that are not supported by factual evidence.").

And to the extent Brinson is relying on comments made by Chief Smith, even if those comments amounted to harassment because of Brinson's race, Brinson has not pointed to evidence that these comments are sufficiently "severe or pervasive" under Sixth Circuit case law. To determine whether workplace harassment is sufficiently severe or pervasive, the Court is to consider the "totality of the circumstances." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999). The Court is also required to utilize both an objective and subjective test: "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000). "Appropriate factors for the court to consider when determining whether conduct is severe or pervasive enough to constitute a hostile work environment 'include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)).

Considering the totality of the circumstances, the Court finds that no reasonable juror could find that Chief Smith's comments subjected Brinson to a hostile work environment of race discrimination. Brinson never testified how many times Chief Smith made comments about the deaths of Breonna Taylor and/or George Floyd, but Brinson declares that it was "several" times. (Doc. No. 86-6 ¶ 35.) Had Chief Smith made the alleged comments "several times" to a black deputy or other black staff member in a short period of time, then the Court might be more inclined to find the comments could amount to a hostile work environment. But Brinson's role as Director of Diversity is highly relevant when considering the totality of the circumstances here.

As Director of Diversity, Brinson testified that he "welcome[d]" tough conversations (*see* Doc. No. 66-1, at 412:21–413:1), and both Brinson and his replacement testified that "tough conversation[s]" are part of the job. (Doc. No. 66-1, at 412:13–20; Doc. No. 74-1, at 76:7–77:16; 87:22–88:6.) The comments Brinson claims Chief Smith made are all related to the intersection of race and policing. There is no evidence that Chief Smith directed any racially charged comments at Brinson directly. (Doc. No. 66-1, at 420:15–24 (testifying that no one, including Chief Smith, ever made a racist comment directed at him).) Brinson does not contend that Chief Smith made any comments that were physically threatening or humiliating; Brinson only describes Chief Smith's comments as "hurtful." (Doc. No. 86-6 ¶ 35.) And Brinson never contends that these comments unreasonably interfered with his work performance. Rather, Brinson declares that while he felt offended, he could "maintain [his] professionalism each time [they] spoke about these hurtful issues." (*Id.*) Nothing in the record rises to sufficiently severe and pervasive harassment

that could advance Brinson's hostile work environment claim. *See Williams v. CSX Transp. Co.*, 643 F.3d 502, 513 (6th Cir. 2011) (granting summary judgment to defendants on hostile work environment claim) ("[S]tatements . . . calling Jesse Jackson and Al Sharpton 'monkeys' and saying that black people should 'go back to where [they] came from'—are certainly insensitive, ignorant, and bigoted. But they more closely resemble a 'mere offensive utterance' than conduct that is 'physically threatening or humiliating.'").

Even if Brinson had cited to *any* instances of harassment that could amount to sufficiently severe harassment under Sixth Circuit case law, there is no evidence that Summit County knew or should have known about the harassment and failed to act. Brinson's opposition brief presupposes that Brinson reported complaints of harassment (Doc. No. 86, at 32), but Brinson testified that he never reported his perceived hostile work environment. (Doc. No. 66-1, at 412:3–12.) And for the reasons discussed *supra*, neither his March 21, 2021 Email nor any follow-up to the Black Male Summit Email amount to reports of harassment or discrimination because of his race.

Brinson has failed to establish his claim of a hostile work environment in violation of either the Equal Protection Clause, Title VII, or Ohio law. Accordingly, Brinson's *Monell* claim against Summit County fails because he has not asserted the deprivation of any right guaranteed by the Constitution or federal law. *Davis v. Chorak*, 1:22-cv-166, 2022 WL 3701571, at *6 (W.D. Mich. Aug. 26, 2022) ("'[T]here can be no liability under *Monell* without an underlying constitutional violation.'" (quoting *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014)) (further citations omitted)).

But even if Brinson could establish a hostile work environment claim, his *Monell* claim still fails because he has not produced any evidence that Fatheree ratified any harassment or

23

discrimination by her subordinates. "An official acting with the final decision-making authority may ratify the unconstitutional acts of its employees in two ways. The first is through 'affirmative approval of a particular decision made by a subordinate.' The second is by 'failing to meaningfully investigate and punish allegations of unconstitutional conduct.'" *Alsaada v. City of Columbus*, 536 F. Supp. 3d 216, 270–71 (S.D. Ohio 2021) (first quoting *Feliciano v. City of Cleveland*, 988 F.2d 649, 650 (6th Cir. 1993), then quoting *Wright v. City of Euclid*, 962 F.3d 852, 882 (6th Cir. 2020) (further citations omitted)).

First, there is no evidence that Fatheree affirmatively approved any unlawful harassment or discrimination by one of her subordinates. At most, Fatheree observed a conversation between Chief Smith and Brinson about Breonna Taylor and/or George Floyd's deaths but did nothing to stop or remedy the conversation. (*See* Doc. No. 66-1, at 340:13–16.) Even if Chief Smith's comments amounted to racial harassment, Fatheree's passive presence is not the type of affirmative ratification that has been found to establish a *Monell* claim based on a single violative act. *See Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013) ("[O]n a single-act theory, a plaintiff must demonstrate that a deliberate choice to follow a course of action is made from among various alternatives by the official . . . responsible for establishing final policy with respect to the subject matter in question. Moreover, that course of action must be shown to be the moving force behind or cause of the plaintiff's harm." (quotation marks and citations omitted)).

Second, Brinson has not pointed to any evidence that suggests Fatheree failed to investigate unlawful harassment and discrimination. It has been well established at this point that Brinson never actually reported any perceived harassment or discrimination to Fatheree. The only potential racial discrimination reported to Fatheree concerned Outley. Even if Fatheree failed to investigate

24

that incident, and it amounted to harassment or discrimination, one failure does not establish a pattern. *Stewart v. City of Memphis*, 788 F. App'x 341, 345 (6th Cir. 2019) ("To establish that a municipality has ratified illegal actions, a plaintiff may prove that the municipality has a pattern of inadequately investigating similar claims. Importantly, there must be multiple earlier inadequate investigations and they must concern comparable claims." (internal citations omitted)).

For all the aforementioned reasons, Summit County is entitled to judgment as a matter of law on Brinson's *Monell* claim and this claim is dismissed.

### 4. Brinson Cannot Establish That Summit County Discriminated Against Him Because of His Race in Violation of Title VII and Ohio Law.

Title VII prohibits employers from engaging in "unlawful employment practice[s]," including discharging an employee because of the employee's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). Similarly, Ohio Rev. Code § 4112.02(A) prohibits an employer from discriminating against an individual on a variety of bases, including race. The Ohio Supreme Court has held that federal case law interpreting Title VII is generally applicable to employment discrimination claims brought under Ohio Rev. Code § 4112.02. *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civ. Rts. Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981) ("[F]ederal case law interpreting Title VII . . . is generally applicable to cases involving alleged violations of [Revised Code] Chapter 4112."); *see also Mitchell*, 964 F.2d at 582.

To establish a *prime facie* case of employment discrimination based on termination, a plaintiff must show that

> 1) he is a member of a protected class; 2) he was qualified for the job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action [(was discharged)]; and 4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of his protected class.

25

*Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014) (footnote omitted).

Once a plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to overcome the presumption of discrimination by coming forward with evidence of a legitimate, non-discriminatory reason for its actions. *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013). If the defendant articulates a non-discriminatory reason, then the defendant has successfully rebutted the presumption of discrimination that was raised by the *prima facie* case. The plaintiff must then present evidence that the defendant's proffered reason was mere pretext for unlawful discrimination.[11] *Id.*

Here, it is undisputed that Brinson was replaced by someone from the same protected class. (Doc. No. 66-1, at 418:21–419:5.) Further, Brinson has not cited any evidence establishing that he was treated less favorably than similarly situated white employees. Fatheree testified that she terminated a white at-will employee (Chief Smith) for analogous reasons as those given for terminating Brinson (disagreements over job-related conduct). (Doc. No. 69-1, at 415:12–18.) Brinson does not dispute this fact and, in fact, concedes that Chief Smith is a "comparator" for purposes of this Court's analysis. (Doc. No. 86, at 35.)

Nonetheless, Brinson attempts to create a genuine issue of material fact by contending that he was treated less favorably because (1) Fatheree held him to a higher standard because of his position; (2) he was expected to handle the "tough conversations"; (3) he was the only member of the cabinet who had to apply and interview for a position, which he was ultimately given; (4) he was the only employee threatened that he would not make it to his start date; (5) he was the only

---

[11] Courts use this burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), when, as here, there is no direct evidence of discrimination based on any of the protected characteristics.

employee expected to memorize the Sheriff's Office's polices and union contracts; (6) he was the only employee whose job responsibilities were actively undermined and performed by others; (7) he was the only employee accused of being unprofessional under Fatheree's tenure; and (8) he was the only employee fired after just twenty working days of employment. (*Id.* at 36–37.) Most of these contentions have been addressed by the Court in this memorandum opinion already and the Court has found that they do not evince that Brinson was being discriminated against because of his race. As for the contentions not addressed explicitly already, the same is true. Even if Fatheree believed that, by its very nature, the Director of Diversity position demanded a higher level of professionalism than other positions within the department, the Director of Diversity position itself is not a protected class and there is no evidence that Fatheree held Brinson to a higher standard because of his race. Further, as the Sixth Circuit has repeatedly noted, "in cases where the hirer and firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 463 (6th Cir. 1995) (quotation marks omitted). Simply put, there is *no* evidence in the record (besides Brinson's own conclusions) that he was treated differently *because of his race*. For these reasons alone, Brinson has failed to present evidence that establishes a *prime facie* case of unlawful termination based on his race and Summit County is entitled to judgment in its favor.

But even if Brinson had established a *prime facie* case of unlawful termination based on his race, Summit County has provided a legitimate, non-discriminatory reason for its actions and Brinson cannot establish that the reason was mere pretext. To establish pretext, a plaintiff may

show that the defendant's proffered reason "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Carter v. Univ. of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003) (quotation marks and citation omitted).

Brinson contends that there is a genuine issue of material fact as to whether he was qualified for the position and, thus, a genuine issue of material fact as to whether Fatheree's stated reason for his termination was pretextual. (Doc. No. 86, at 37.) In doing so, Brinson completely ignores Fatheree's actual stated reasons for terminating his employment. Fatheree does not claim she terminated Brinson because he lacked any enumerated "experience," "education," or "skill" (*see id.*)—Fatheree declared (and testified) that she terminated Brinson because he was not the "right person" for the position and "not what he represented himself . . . to be." (Doc. No. 79-1 ¶ 34; *see also* Doc. No. 69-1, at 416:3–8; 465:2–15.) Thus, whether Brinson was objectively "qualified" for the position is immaterial to whether Fatheree subjectively felt that he was the "right person" for the job or otherwise "not what he represented himself . . . to be."

Fatheree declared that she came to feel Brinson was not the right person for the job because, in part, he was unable to "articulate a plan or add substance to meetings to advance a robust diversity, equity and inclusion program" and because she felt Brinson was "more focused on pushing his desired reporting structure and pursuing his own agenda." (Doc. No. 79-1 ¶ 34.) Brinson does not contest either of these facts in his opposition brief[12] and the record evidence

---

[12] The Court acknowledges that Fatheree stated other reasons supporting her ultimate conclusion that Brinson was not the right person for the job, including her belief that Brinson thought all police officers are racist based on a comment he made. (Doc. No. 69-1, at 416:11–417:10, 419:1–10; 462:9–11.) Brinson testified that he did not say, or intend to say, that all police officers are racist. (Doc. No. 66-1, at 347:21–348:25.) It is immaterial whether Brinson made this statement because, as discussed above, Summit County has provided a sufficient non-discriminatory reason for

supports Fatheree's declaration. (*See, e.g.*, Doc. No. 77-1, at 84:10–85:4; Doc. No. 70-1 (Deposition of Eric Czetli), at 196:18–197:16, 200:7–201:15; *see also id.* at 228:23–229:10 (testifying that he did not think Brinson was the right person for the job even during his interview); Doc. No. 73-1 (Deposition of Matamba Kaalima), at 62:24–65:15 (testifying that he did not think Brinson was the right person for the job even during his interview, ranked him last, and felt Brinson was a "poser"); Doc. No. 69-1, at 357:22–358:12, 408:3–10, 409:7–17.) In fact, Brinson concedes in his own testimony that he did not articulate any plan to Fatheree until March 26, 2021 (*see* Doc. No. 66-1, at 349:13–22, 366:14–368:3; *see also* Doc. No. 86, at 21 n.75)—at which point Fatheree had decided already to terminate his employment. (Doc. No. 69-1, at 418:12–14.) Further, Brinson's own March 21, 2021 Email evinces his clear displeasure with his reporting structure and Brinson does not deny that he was complaining about the reporting structure—even if it was only the first time he did. (*See generally* Doc. No. 66-20; *see also* Doc. No. 86-6 ¶ 44.)

      Brinson seems to suggest that because Fatheree held Brinson to a higher standard and did not give him more time to show he could advance her vision or provide him with clear warning of his shortcomings, that this somehow evinces his termination was because of his race. (*See* Doc. No. 86, at 21–22.) But Brinson was hired as an at-will employee. (Doc. No. 66-1, at 140:8–12.) As an at-will employee, Fatheree had the right to terminate Brinson for any non-discriminatory reason, at any time. (*See id.* at 142:12–25.) Brinson has not pointed to any term in his employment contract that required Fatheree to retain him for any certain period of time so he could demonstrate

---

Brinson's termination that is undisputedly otherwise based in fact. But the record suggests that, whether Brinson intended to be offensive or not, Fatheree thought he was. *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) ("[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect.").

his worth or give him warning of his shortcomings. And, as this Court has found already, even if Fatheree believed that, by its very nature, the Director of Diversity position demanded a higher level of professionalism than other positions within the department, there is no evidence that Fatheree held Brinson to a higher standard because of his race.

Even viewing the evidence before the Court in the light most favorable to Brinson, it suggests only that, after 20 working days, Fatheree was not satisfied with Brinson's performance or priorities and, thus, terminated his employment because she had come to believe that he was not the "right person" for the position and "not what he represented himself . . . to be." There is no evidence of pretext and the Court finds that no reasonable jury could find otherwise.

For all the aforementioned reasons, Summit County is entitled to judgment as a matter of law on Brinson's claims of discrimination under Title VII and Ohio law and these claims are dismissed.

### 5. Brinson Cannot Establish That Fatheree and Summit County Retaliated Against Him Because of His Race in Violation of Title VII and Ohio Law.

Brinson has failed to provide evidence that establishes a *prima facie* case of retaliation under Title VII or Ohio law. A *prima facie* Title VII retaliation claim has four elements: "(1) [plaintiff] engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action." *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008).[13] If the employee makes this

---

[13] Again, Ohio courts have held that "federal case law interpreting Title VII . . . is generally applicable to cases involving alleged violations of [Revised Code] Chapter 4112." *Plumbers & Steamfitters Joint Apprenticeship Comm*, 421 N.E.2d at 131 (collecting cases).

showing, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason for its actions[.]" *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008). If the employer meets this burden, the employee must demonstrate that the legitimate reason offered by the employer "was a pretext designed to mask retaliation." *Id.*

Title VII's opposition clause protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices. *See Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc.*, 495 F. App'x 651, 655 (6th Cir. 2012). And while complaints of protected activity need not use magic words or "be lodged with absolute formality, clarity, or precision," the plaintiff must allege more than a "vague charge of discrimination." *Jackson v. Genesee Cnty. Road Comm'n*, 999 F.3d 333, 345 (6th Cir. 2021) (quoting *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015) (further citations omitted)). In other words, plaintiff's complaint must at least put defendant on notice of opposition to discrimination. *Hines v. Town of Vonore*, 912 F. Supp. 2d 628, 645–46 (E.D. Tenn. 2012).

Brinson contends that his March 21, 2021 Email and his report of potential discrimination against Outley were both oppositions to unlawful discriminatory practices at the Sheriff's Office. (Doc. No. 86, at 39–40.) For the same reasons discussed *supra*, the March 21, 2021 Email does not amount to any reasonable opposition to discriminatory practices. Again, the closest the March 21, 2021 Email comes to evincing opposition to a discriminatory practice is Brinson's contention that he was complaining to Fatheree that race was "off the table" and he was prohibited from addressing racial inequalities within the Sheriff's Office. (Doc. No. 86, at 21.) But, as discussed, at most, Brinson was opposing resistance to his specific plan for addressing racial inequalities at

31

the Sheriff's Office, which is analogous to *Holden v. Owens-Illinois, Inc.*, 793 F.2d 745, 748 (6th Cir. 1986).[14] There, the Sixth Circuit held that an employee's complaints about hostility to her attempts to implement affirmative action plans for her employer did not qualify as protected activity under the opposition clause. *Id.* at 749 ("Since Title VII does not require the adoption of affirmative action programs, to the extent that plaintiff sought to implement an affirmative action plan which would comply with [an executive order], plaintiff was not opposing a practice that violated Title VII."); *see also id.* at 751 ("An employee does not receive special protection under Title VII simply because the employee handles discrimination complaints or works on affirmative action matters."). *Cf. Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000) (opposing discrimination that occurred despite an affirmative action program was protected conduct). Accordingly, nothing in Brinson's March 21, 2021 Email amounts to opposition that can advance his Title VII retaliation claim.

Even if Brinson's report to Fatheree about Outley's experience amounted to protected conduct under Title VII,[15] Brinson has not pointed to any evidence that suggests that there was a causal connection between his report and his termination. As discussed above, Brinson concedes that, after he reported the potential discrimination to Fatheree, he did not know "where [it] went[,]" suggesting the issue never came up again. (Doc. No. 66-1, at 414:1–3.) Thus, besides Brinson's own speculation, there is no evidence that Brinson's report of potential discrimination against

---

[14] Further, as the Court found *supra*, Brinson has not pointed to any evidence, besides his own conclusions, that Fatheree told him he could not address racial inequalities within the Sheriff's Office.

[15] There is a question as to whether Brinson had a reasonable, good faith belief that Outley was being discriminated against on the basis of her race because when asked whether Outley told him she felt discrimination against because of her race, Brinson testified only that he could not recall. (Doc. No. 66-1, at 550:2–5.) *See Jackson*, 999 F.3d at 346 ("To bring a successful claim under the opposition clause, [Brinson] must allege facts that [he] opposed unlawful . . . practices in a reasonable manner and with a reasonable and good faith belief that the practices violated Title VII.").

Outley played any role in Fatheree's decision to terminate his employment. *Jennings*, 630 F. App'x at 555.

For these reasons, Brinson has failed to make a *prima facie* case of retaliation under Title VII or Ohio law and Fatheree and Summit County are entitled to an entry of judgment in their favor on these claims. But even if Brinson had established *prime facie* claims of retaliation under Title VII and Ohio law, as discussed at length above, Fatheree and Summit County have provided a legitimate, non-discriminatory reason for Brinson's termination and Brinson has not produced any evidence that could establish pretext.

Thus, for all the aforementioned reasons, Fatheree and Summit County are entitled to judgment as a matter of law on Brinson's claims of retaliation under Title VII and Ohio law and these claims are dismissed.

### 6. Brinson's Claim Against Fatheree, Czetli, and Summit County for Aiding-and-Abetting Discrimination in Violation of Ohio Law Fails.

Ohio law makes it unlawful "[f]or any person to aid, abet, incite, compel, or coerce the doing of any act declared by this section to be an unlawful discriminatory practice[.]" Ohio Rev. Code § 4112.02(J). Where, as here, a court finds that a plaintiff's underlying Section 4112.02 claims of discrimination, retaliation, and hostile work environment fail as a matter of law, "the court must also necessarily grant summary judgment on the claim of aiding and abetting those claims." *Weinrauch v. Sherwin-Williams Co.*, No. 1:18-cv-1696, 2019 WL 3007031, at *14 (N.D. Ohio July 10, 2019). Accordingly, Fatheree, Czetli, and Summit County are entitled to judgment as a matter of law on Brinson's claim of aiding-and-abetting under Ohio law and these claims are dismissed.

**7. Brinson Cannot Establish That Fatheree Improperly Interfered with Any Business Relationship in Violation of Ohio Law.**

Brinson unsuccessfully attempts to establish that Fatheree interfered with his business relationships because his reputation has been harmed by his termination and comments Fatheree made in the aftermath. To state a claim of tortious interference with a business relationship under Ohio law, Brinson must plead (1) a business relationship; (2) the wrongdoer's knowledge of the relationship; (3) the wrongdoer's intentional and improper action taken to prevent a contract formation, procure a contractual breach, or terminate a business relationship; (4) a lack of privilege; and (5) resulting damages. *Barrio Bros., LLC v. Revolucion, LLC*, No. 1:18-cv-2052, 2020 WL 3547014, at *7 (N.D. Ohio. June 30, 2020) (quoting *N. Chem. Blending Corp., Inc. v. Strib Indus., Inc.*, No. 105911, 2018 WL 4043487, at *6 (Ohio Ct. App. Aug. 23, 2018) (quotation marks omitted)).

When asked what business relationships Fatheree thwarted, Brinson testified that some people have stopped returning his calls.[16] (Doc. No. 66-1, at 431:14–433:7.) But Brinson admitted that none of those people ever employed him, and he did not testify that they ever would. (*See* Doc. No. 66-1, at 439:12–16.) Instead, Brinson testified that, in his view, Fatheree's statements interfered with prospective business opportunities that he might secure through these community contacts, similarly to how he was hired as Director of Diversity. (*See id.*) But since his termination from the Sheriff's Office in 2021, it is undisputed that Brinson was able to secure two different income-generating positions—both of which he quit. (Doc. No. 66-1, at 442:2–12, 464:23–465:2.)

---

[16] Brinson testified more generally that some people, like Jeff Fusco and Pastor Pounds, have stopped proactively reaching out to him, but then admitted that he has not reached out to them either. (Doc. No. 66-1, at 435:3–436:1.)

34

Viewing the evidence in the light most favorable to Brinson, it, at most, suggests that Brinson might have suffered reputational harm with community relationships—not any inference with a business relationship.[17]

At this stage of the proceedings, Brinson's claim cannot stand on conclusory allegations that various members of the community, who he admittedly never sought to engage in a business relationship, have stopped communicating with him. *Gooden v. City of Memphis Police Dep't*, 67 F. App'x 893, 895 (6th Cir. 2003) ("Conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not enough to defeat a well-supported motion for summary judgment." (citing, among authority, *Lujan*, 497 U.S. at 888)). Brinson must identify *some* business relationship with which Fatheree improperly interfered for his claim to advance. He has not. *See Marinelli v. Prete*, No. E-09-022, 2010 WL 2025374, at *6 (Ohio Ct. App. May 21, 2010) ("The record reveals no evidence that appellant had a business relationship with anyone or a prospective contractual relationship with anyone with which appellees intentionally interfered."). For this reason alone, Fatheree is entitled to judgement as a matter of law on Brinson's claim of tortious interference with a business relationship.

But even if Brinson had established some business relationship with which Fatheree interfered, there is no evidence that any statement Fatheree made about Brinson amounts to improper interference. A defendant is only liable for tortious interference if the interference was

---

[17] Allegations of reputational harm to community relationships are more properly adjudicated through claims of defamation, which Brinson did not bring in this suit. *See Disciplinary Couns. v. Gardner*, 793 N.E.2d 425, 432 (Ohio 2003) ("Defamation actions seek to remedy an essentially private wrong by compensating individuals for harm caused to their reputation and standing in the community."); *see also Hooper v. Seventh Urban, Inc.*, 434 N.E.2d 1367, 1374 (Ohio Ct. App. 1980) ("[T]he only damages alleged to have been caused by appellants' statements were injury to [appellee's] reputation . . . . The proper remedy for an injury to reputation would have been an action for defamation[.]").

improper. *See Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 860 (Ohio 1999). A plaintiff must prove that the defendant "knew [the statements] were false or acted with reckless disregard of whether they were true or false." *A & B–Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283, 1294 (Ohio 1995) (quotation marks and citation omitted). "The Ohio Supreme Court has recognized that expressions of opinion are generally protected under Section 11, Article I of the Ohio Constitution." *Gentile v. Turkoly*, 86 N.E.3d 991, 999 (Ohio Ct. App. 2017) (citing *Vail v. The Plain Dealer Publ'g Co.*, 649 N.E.2d 182 (1995) (further citation omitted)). "Merely communicating a good faith opinion to another person does not rise to the level of tortious interference." *Gentile*, 86 N.E.3d at 998 (citing *Altier v. Valentic*, No. 2003-G-2521, 2004 WL 2376265, at *3 (Ohio Ct. App. Oct. 22, 2004)).

Brinson points only to Fatheree's statements in a newspaper article and communications with pastors as "evidence" of improper interference. (Doc. No. 86, at 43.) But the record clearly establishes that Fatheree had a good faith opinion that Brinson was not the "right person" for the job and, in her view, lacked professionalism based on how she perceived certain comments Brinson made about police officers.[18] It is immaterial whether Brinson meant what Fatheree interpreted because Brinson does not deny having the at-issue conversation with Fatheree. Fatheree has clearly testified that she interpreted his comments to be unprofessional and troubling, and Brinson has not presented any evidence that suggests otherwise. (*See, e.g.*, Doc. No. 69-1, at 423:16–20.)

---

[18] Brinson cites to Fatheree's testimony that she knew her statements to the newspaper were not "nice" but that does nothing to suggest Fatheree knowingly made a false statement. (Doc. No. 86, at 43 (citing Doc. No. 69-1, at 421:11–18).)

For the aforementioned reasons, Fatheree is entitled to judgement as a matter of law on Brinson's claim of tortious interference with a business relationship and this claim is dismissed.

### 8. Brinson Has Not Identified Any Employee Who Caused Him Foreseeable Injury Because of Summit County's Negligent Training or Supervision in Violation of Ohio Law.

Brinson cannot advance his claims of negligent training and supervision against Summit County because he has not identified a single employee who foreseeably caused him injury. To advance his claims of negligent training and negligent supervision under Ohio law, Brinson must show: (1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employer's act or omission causing plaintiff's injuries; and (5) the employer's negligence in training or supervising the employee as the proximate cause of plaintiff's injuries. *See, e.g.*, *Browning v. Ohio State Hwy. Patrol*, 786 N.E.2d 94, 103–04 (Ohio Ct. App. 2003); *Linder v. Am. Nat'l Ins. Co.*, 798 N.E.2d 1190, 1197 (Ohio Ct. App. 2003); *see also Madera v. KTC Express, Inc.*, No. 3:19-cv-1516, 2022 WL 2916868, at *6 (N.D. Ohio July 25, 2022).

It is not clear exactly what injury Brinson claims he suffered because of any negligent training or negligent supervision. In his opposition brief, Brinson contends that he was "subjected to unlawful bias, harassment, discrimination and retaliation by Fatheree, Czetli, Smith and others[.]" (Doc. No. 86, at 46.) To the extent Brinson claims he was retaliated against because of his race, this Court has found no evidence of that in the record. Further, there is no evidence that Fatheree, Czetli or unnamed "others" subjected Brinson to any bias, harassment, or discrimination because of his race. Brinson also contends that he suffered some injury because no one was trained to respond to his "complaints" of unlawful harassment and discrimination, which allowed

37

harassment and discrimination to continue against him (*id.*), but, as this Court found and discussed at length *supra*, there were no complaints for any employee to respond to because Brinson never raised a complaint of unlawful harassment or discrimination directed at him.[19]

As such, the only Summit County employee who Brinson identified and who potentially "subjected" Brinson to "unlawful bias, harassment [or] discrimination" was Chief Smith. Even if Chief Smith's comments were racially motivated attacks, rather than comments motivated by a desire to engage in a conversation with the Director of Diversity, Brinson cannot establish that Summit County's failure to train or supervise Chief Smith was the proximate cause of any injury[20] because Brinson has failed to establish that Summit County had any reason to foresee that Chief Smith would engage in racially motivated attacks. *Browning*, 786 N.E.2d at 103 ("The legal viability of [plaintiff's] claims of negligent hiring and retention [are] dependent upon a showing that [the employee's] conduct was foreseeable.").

To advance his claims, Brinson relies on generalizations about the Sheriff's Office's anti-discrimination and anti-harassment training. Specifically, Brinson contends that (1) Summit County knew its employees were inadequately trained concerning anti-discrimination and anti-harassment laws and procedures, (2) but Summit County failed to train employees about the same,

---

[19] To the extent Brinson is alleging that Summit County failed to address complaints of harassment and/or discrimination directed against others, Brinson does not contend that the same wrongdoers harassed or discriminated against him. Further, Brinson lacks standing to bring a claim of negligent training and/or supervision on behalf of others.

[20] Again, it is not clear what injuries Brinson contends he suffered. He does not cite any injury when discussing his negligent training or supervision claim in his opposition brief. Elsewhere, he contends that "[t]he culmination of [d]efendants' unlawful conduct has . . . caused Mr. Brinson to suffer from depression, anxiety, weight gain and more as a direct result of [d]efendants' discrimination and retaliation." (Doc. No. 86, at 26.) But Brinson actually declares that his depression and anxiety are because of the way he was "treated by Summit County, Sheriff Fatheree and Mr. Czetli." (Doc. No. 86-6 ¶ 59.) Thus, it would appear Brinson does not contend that Chief Smith's comments caused him any injury in fact.

and, thus, (3) Summit County should have foreseen that its employees would harass or discriminate against others. (Doc. No. 86, at 44.) Such generalized assertions are insufficient to advance Brinson's claims of negligent training or negligent supervision because he must show that Summit County had reason to know that Chief Smith specifically had a propensity to engage in discriminatory conduct. *Herndon v. Torres*, 249 F. Supp. 3d 878, 889 (N.D. Ohio 2017) ("An act is reasonably foreseeable only if the employer knew or should have known of the employee's propensity to engage in similar criminal, tortious, or dangerous conduct." (quoting *Johnson v. J.B. Hunt Transp., Inc.*, No. 3:09-cv-1352, 2009 WL 4282941, *6 (N.D. Ohio Nov. 30, 2009))).

Brinson has not pointed to any evidence that suggests Summit County should have foreseen that Chief Smith might subject Brinson to harassment or discrimination. Brinson points to no evidence that anyone ever complained that Chief Smith harassed or discriminated against them because of their race.[21] Further, as mentioned multiple times now, there is no evidence that Brinson ever reported feeling that Chief Smith was harassing or discriminating against Brinson at the time. At most, Brinson cites to one instance when Fatheree was present for certain comments that Chief Smith made to Brinson. This single instance is insufficient to put Fatheree or Summit County on notice that Chief Smith would potentially subject Brinson to racial harassment or discrimination "on several occasions[.]" *See Chapa v. Genpak, LLC*, No. 12AP-466, 2014 WL 1347980, at *25–26 (Ohio Ct. App. Mar. 11, 2014) (finding that a few offensive comments made in the presence of supervisors on two separate occasions was not enough to establish foreseeability of future

---

[21] In his opposition brief, Brinson contends that Fatheree "knew that Smith often spreads discriminatory rhetoric, yet she did nothing about it." (Doc. No. 86, at 18.) But Brinson cites *no* evidence that Fatheree knew Chief Smith had some history of "spread[ing] discriminatory rhetoric." Brinson only cites to testimony concerning the one interaction Fatheree witnessed between Brinson and Chief Smith, which Brinson now contends was harassment/discrimination.

harassment because one of the comments was not clearly discriminatory and plaintiff did not complain to anyone about the comment).

Where, as here, "a plaintiff fails to show through evidence that the [offending] employee had any criminal or tortuous propensities, summary judgment in the employer's favor on negligent hiring and [supervision] is proper." *Hout v. City of Mansfield*, 550 F. Supp. 2d 701, 745 (N.D. Ohio 2008). For these reasons, Summit County is entitled to judgment as a matter of law on Brinson's claims of negligent supervision and training and these claims are dismissed.

## IV. John Doe Defendants

Plaintiff also named "John Does 1–10" as defendants in this case. "The Sixth Circuit has held that a civil action against Doe defendants never commences where they were not identified by their real names or served with process." *See Wheeler v. Billingslea*, No. 18-cv-10346, 2019 WL 2524081, at *4 (E.D. Mich. June 19, 2019) (citing *Cox v. Treadway*, 75 F.3d 230, 240 (6th Cir. 1996) (further citation omitted)). "Until a plaintiff amends his complaint to identify a John Doe defendant by his true name, 'the John Doe allegations in the complaint are mere superflusage.'" *Id.* (quoting *Smith v. City of Chattanooga*, No. 1:08-cv-63, 2009 WL 3762961, at *5 (E.D. Tenn. Nov. 4, 2009) (collecting cases)). Here, fact discovery ended several months ago, and Brinson never moved to amend his complaint to identify and serve any one of the "John Does 1–10." Accordingly, any claims against "John Does 1–10" are dismissed.

## V. CONCLUSION

Throughout the pendency of this matter, Brinson's claims have been somewhat of a moving target. What is clear is that Brinson believes he was subjected to race-based discrimination, harassment, and retaliation. But to survive this motion for summary judgment, Brinson had to

produce *some evidence*, beyond his subjective beliefs and bald conclusions, that he faced discrimination, harassment, and retaliation *because of his race*. This, Brinson failed to do. All the well-pleaded evidence before the Court suggests that Brinson was simply not the "right person" for the Director of Diversity position. Speculation and conclusions by Brinson that he faced "pushback" or "targeting" because his job and job duties related to race are not proper bases for his claims. This Court is unaware of any court that has found that a Director of Diversity is a protected class, and this Court denies Brinson's implicit invitation to be the first.

For all the aforementioned reasons, Brinson's claims against all defendants are dismissed and this case is closed.

**IT IS SO ORDERED**.

Dated: June 20, 2023

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**
**CHIEF JUDGE**